'O'

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITAL PHARMACEUTICALS d/b/a Bang Energy; and JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,<br><br>          Plaintiffs,<br><br>     v.<br><br>PHD MARKETING, INC.,<br><br>          Defendant. | CV 20-06745-RSWL-JCx<br><br>**ORDER re: Findings of Fact & Conclusions of Law in Ruling for Plaintiffs**<br><br><br>Complaint Filed: May 19, 2020<br><br>Trial Date: May 31-June 1, 2022 |

     Plaintiffs Vital Pharmaceuticals, Inc. ("Vital")
and JHO Intellectual Property Holdings, LLC ("JHO")
(collectively, "Plaintiffs") initiated this Action
against Defendant PhD Marketing, Inc. ("Defendant") for
trademark infringement and unfair competition arising
from Defendant's infringement of Plaintiffs' registered
"BANG" mark and "B" logo.  On May 31 and June 1, 2022,
the Court conducted a bench trial.  Having considered

1  the evidence, the parties' objections to the evidence,
2  the credibility of the trial witnesses, and both
3  parties' arguments at trial, the Court issues the
4  following findings of fact and conclusions of law
5  pursuant to Rule 52(a) of the Federal Rules of Civil
6  Procedure.

## I.  FINDINGS OF FACT

7
8  1.  <u>The Parties</u>

9       Vital has manufactured and sold energy drinks
10  consistently using its "BANG" and "B" logos (the "BANG
11  Marks") since at least February 2016.  Day 1 Vol. 1 Tr.
12  35:15-19, 39:4-12, 40:9-13; Ex. 98 at 42.  Vital uses
13  its BANG Marks to promote its products and its brand,
14  and most of Vital's promotion takes place on social
15  media.  Day 1 Vol. 1 Tr. 36:12-17; Ex. 103.  Vital also
16  sells other merchandise using the BANG Marks, such as
17  clothing, coolers, and pens.  Day 1 Vol. 2 Tr. 9:5-10:1;
18  Ex. 34.  In advertising its BANG products, Vital places
19  large emphasis on its drink being the "healthy energy
20  drink on the market."  Day 1 Vol. 1 Tr. 37:20-24.

21       Defendant runs a "cash and carry" business out of
22  an approximately 12,000 square-foot warehouse.  Day 2
23  Vol. 1 Tr. 45:22-25.  Defendant's customers typically
24  come to the warehouse and choose the products they would
25  like to purchase, and then customers either carry out
26  the products themselves or have Defendant ship the
27  products to them.  <u>Id.</u> at 45:25-46:1.
28  ///

2.   The Infringing Products

In June 2019, Defendant received a sample shipment of vaping products from VTEK, a Chinese supplier.  Id. at 30:10-16, 55:25-56:5; Ex. 2014.  The packaging for these products contained the word "bang" and a star-shaped symbol in the middle of the "b."  Ex. 2006. Defendant refers to this logo as "Design One."  Day 2 Vol. 1 Tr. 8:20-9:7.  Below is a side-by-side comparison of the BANG Mark (taken from Exhibit 93) and Design One (taken from Exhibit 2006):

|  |  |
|---|---|
| BANG Mark (Ex. 93) | Design One (Ex. 2006) |

In July 2019, Defendant sent the VTEK vaping products to its customers to get feedback on their quality and functionality.  Id. at 56:14-17.  By April 2020, Defendant had agreed to order more vapes manufactured by VTEK and began regularly selling them to customers.  Id. at 56:21-57:5; Ex. 2014.  Defendant had agreed to be responsible for all sales and distribution of VTEK's vaping products within the United States.  Day 2 Vol. 1 Tr. 54:24-56:2, 69:10-14.  Defendant sold two different models of vape pens using Design One, one

1  known as "Bang Bars" and the other known as "XL" vape
2  pens.  Ex. 2014.  Defendant typically sold Bang Bars to
3  its customers at a price of around $4 and typically sold
4  XL vape pens to its customers at a price of around $5.
5  Jaber Dep. 129:2-20.

6      Once Defendant began selling VTEK's vaping
7  products, a VTEK representative known as Bob would
8  frequently visit Defendant's warehouse to verify the
9  quantity of vape pens remaining on the shelves and to
10 discuss future orders.  Day 2 Vol. 1 Tr. 61:10-13.  Bob
11 and Samir Jaber, Defendant's CEO, would agree on the
12 models and quantities of products to be ordered from
13 VTEK, and those products would be shipped to Defendant's
14 warehouse with an accompanying invoice.  Id. at 62:22-
15 63:1.  Defendant would often receive quantities that
16 varied from the amount reflected on the invoice, so
17 Defendant would count what it received and log that
18 amount into Defendant's QuickBooks account.[1]  Id. at
19 63:1-8.

20     In June 2020, VTEK changed the design of its vape
21 pens to use what is known as "Design Two."  Day 2 Vol. 1
22 Tr. 59:25-60:5.  Design Two is the same as Design One
23 with the addition of the words "vape with a" above the

24 _____

25     [1] Defendant's General Manager, Khajadour Semikian, testified
   that Bob and Jaber would confer on the proper amount to be paid
26 to VTEK and would instruct Semikian to pay that amount.  Id. at
   77:15-78:5.  Semikian would then input the amount paid and apply
27 it to the invoices in the QuickBooks system.  Id. at 78:5-6.  The
   payments made by Semikian did not tie directly to particular
28 invoices; the payments sometimes covered only a portion of an
   invoice and sometimes covered multiple invoices.  Id. at 78:7-9.

1   word "bang."[2]  Day 2 Vol. 1 Tr. 11:25-12:3; Ex. 2008.

2   VTEK began shipping vape pens using Design Two to

3   Defendant in June 2020, and Defendant sold vape pens

4   using only Design Two from June 2020 until it ceased

5   selling VTEK's products.  Day 2 Vol. 1 Tr. 60:2-12; Ex.

6   2014.  Defendant only sold XL and XXL vape pens using

7   Design Two.  Ex. 2014.  Defendant typically sold XXL

8   vape pens, which were bigger and heavier than the other

9   two models, to its customers at a price between $7.50

10  and $9.  Day 2 Vol. 1 Tr. 59:3-7.

11  3.  Vital Receives Notice of Infringing Products

12      Meanwhile, on April 2, 2020, Vital received an

13  email from a marketing and distribution company

14  requesting more information about a vaping product

15  labelled with Design One.  Ex. 45.  After receiving

16  notice of this product and believing that Design One

17  infringed on Plaintiffs' trademark rights, Vital sent

18  cease-and-desist letters in May 2020 to companies that

19  it believed were selling vaping products using Design

20  One.  Exs. 2002-04.  On May 4, 2020, Semikian sent a

21  letter to one of Defendant's customers agreeing to

22  indemnify it from any trademark claims made by third

23  parties.  Day 2 Vol. 1 Tr. 7:22-24, 23:6-24:13; Ex. 2.

24  On May 13, 2020, Semikian received a letter from the

25  same customer notifying Semikian that it had indeed

26  received a cease-and desist letter from Vital.  Day 2

27

28      [2] The vaping products using either Design One or Design Two
    will collectively be referred to as the "Infringing Products."

1   Vol. 1 Tr. 26:20-27:4; Ex. 1.

2       On June 2, 2020, Vital's customer service

3   department received an email regarding a product quality

4   control concern.  Ex. 42.  In the email, the customer

5   stated that he loves the BANG brand and frequently buys

6   BANG energy drinks but was "highly disappointed" with

7   the quality of their vape pen.  Id.  He stated that he

8   was excited to try all the vape flavors, but because of

9   his negative experience, he did not think he would buy

10  another one.  Id.  On July 11, 2020, a Facebook account

11  for a vendor posted a picture of BANG energy drinks

12  together with the Infringing Products to notify

13  followers that the store had both in stock.  Ex. 112.

14  From December 2020 through March 2021, Defendant also

15  received inquiries about its affiliation with BANG

16  energy drinks.  Day 2 Vol. 1 Tr. 35:10-19; Exs. 2019-23.

17  In October 2020, Defendant sought to obtain copyrights

18  over Design One and Design Two.  Ex. 2017.

19  4.  Defendant Ceases Sales of Infringing Products

20      Defendant stopped selling the Infringing Products

21  in April 2021, in part because of its ongoing litigation

22  with Plaintiffs, and in part because it became difficult

23  to compete with other companies that had started selling

24  "copycat" products with packaging using Design One and

25  Design Two.  Day 2 Vol. 1 Tr. 67:25-68:19.  Once

26  Defendant decided to stop selling the Infringing

27  Products, it sold off its remaining inventory.  Id. at

28  31:22-24.

1    In total, Defendant sold 730,207 vape pens that
2    used Design One and 1,097,629 vape pens that used Design
3    Two.  Ex. 2032.  Defendant's total revenue for Design
4    One was $3,520,968.53.  Ex. 2028 at 4-5.  Defendant's
5    total revenue for Design Two was $7,252,971.95.  Id. at
6    2-3.  Thus, Defendant's total revenue for its sales of
7    the Infringing Products was $10,773,940.48.  Id.

## II.   CONCLUSIONS OF LAW

9    On February 4, 2022, the Court entered judgment in
10   favor of Plaintiffs and against Defendant for
11   Plaintiffs' trademark infringement and unfair
12   competition claims and dismissed Defendant's
13   counterclaims with prejudice [151].  Thus, the only
14   issues remaining are the equitable remedies to be
15   awarded for Defendant's trademark infringement.
16   Specifically: (1) whether Plaintiffs are entitled to
17   disgorgement of profits under the Lanham Act, and if so,
18   the amount of net profits to be awarded; (2) whether
19   Plaintiffs are entitled to a permanent injunction; and
20   (3) whether Plaintiffs are entitled to attorneys' fees
21   under the Lanham Act.

## A.   Disgorgement of Profits

23   The Lanham Act provides that once trademark
24   infringement has been established, a plaintiff is
25   entitled, "subject to the principles of equity, to
26   recover . . . defendant's profits."  15 U.S.C. § 1117.
27   This statute affords district courts "broad discretion"
28   in fashioning a remedy for trademark infringement.

1  _Maier Brewing Co. v. Fleischmann Distilling Corp._, 390

2  F.2d 117, 124 (9th Cir. 1968).

3      1.  Willfulness

4      While a finding of willfulness is not a

5  prerequisite to disgorgement of profits, "a trademark

6  defendant's mental state [remains] a highly important

7  consideration in determining whether an award of profits

8  is appropriate."  _Romag Fasteners, Inc. v. Fossil, Inc._,

9  140 S. Ct. 1492, 1497 (2020).  District courts should

10  therefore consider a defendant's mental state in

11  determining what award of profits is appropriate.

12  _Grasshopper House, LLC v. Clean & Sober Soc. Media, LLC_,

13  2021 WL 3702243, at *3 (9th Cir. Aug. 20, 2021).

14      Here, the Court finds that Defendant's mental state

15  sufficiently warrants disgorgement of the profits

16  Defendant received from its sale of the Infringing

17  Products.  The evidence at trial revealed that Defendant

18  continued to sell the Infringing Products, and even

19  purchased additional products from VTEK, long after it

20  became aware of Plaintiffs' BANG Marks.  Day 2 Vol. 1

21  Tr. 23:6-24:13, 60:2-12; Exs. 2, 2014.  Plaintiffs put

22  forth evidence of confused consumers, see Exs. 42, 60,

23  as well as confused vendors, see Exs. 61, 83, 112, 118.

24  Notably, the instances of consumer confusion included

25  emails received by Defendant directly, see Exs. 2019-24.

26  This confusion is unsurprising given the similarity of

27  the marks.

28      Defendant was therefore on notice of at least one

instance of consumer confusion as early as June 30, 2020, but it did not stop selling the Infringing Products until April 2021.  Day 2 Vol. 1 Tr. 68:2-3. Defendant also sought to obtain copyrights over Design One and Design Two in October 2020, despite its knowledge of Plaintiffs' nearly identical BANG Marks. Ex. 2017.  Moreover, Defendant stopped selling the products not in recognition of Plaintiffs' trademark rights, but because it was no longer profitable to continue sales.  Id. at 68:8-15.

Defendant's continued sales despite its knowledge of consumer confusion with Plaintiffs' nearly identical marks is indicative of an improper motive.  See Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993) (internal quotation marks and citation omitted) ("Willfulness and bad faith require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense."); Monster Energy Co. v. Integrated Supply Network, LLC, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021) (finding willfulness where "[d]efendant continued to sell the infringing products after it received [p]laintiff's cease and desist letters and after [p]laintiff filed the instant lawsuit"); Color Me Mine Enters. Inc. v. S. States Mktg. Inc., No. CV 12-00860-RGK (JCx), 2013 WL 12119715, at *11 (C.D. Cal. Apr. 25, 2013) (finding a triable issue of fact as to willfulness where defendant continued to sell infringing product

1    despite knowledge of plaintiff's mark and the likelihood

2    of consumer confusion).  The Court therefore concludes

3    that disgorgement of Defendant's profits is warranted

4    here based on Defendant's willful infringement.

5        2.   Net Profits

6        In determining the profits to be disgorged, the

7    plaintiff bears the burden to prove the defendant's

8    gross sales from the infringing activity with reasonable

9    certainty.  15 U.S.C. § 1117(a).  Once the plaintiff

10   demonstrates gross sales, they are presumed to be the

11   result of the infringing activity.  Lindy Pen, 982 F.2d

12   at 1408.  The burden then shifts to the defendant to

13   prove which, if any, of its total sales are not

14   attributable to the infringing activity and any

15   permissible cost deductions.  15 U.S.C. § 1117(a).

16       a.   Gross Sales

17       At trial, Plaintiffs' damages expert relied on

18   income statements provided by Defendant to determine

19   that Defendant's total sales from January 2018 through

20   April 2021 for products using Design One and Design Two

21   were $10,773,940.48.  Day 2 Vol. 2 Tr. 94:17-97:17; Ex.

22   2028.  Defendant's damages expert agreed with this

23   figure as an accurate representation of Defendant's

24   gross sales.  Day 2 Vol. 2 Tr. 28:23-29:8.  This figure

25   appears credible given the total number of vapes

26   Defendant claims to have sold and the estimated price of

27   the vapes sold to Defendant's customers.[3]  See Ex. 2032;

28   _____

          [3] Indeed, while the Court accepts the figure provided by the

10

Jaber Dep. 129:2-130:1.  Therefore, Plaintiffs have met their burden of proving Defendant's sales.  See Monster Energy, 533 F. Supp. at 937 (finding that plaintiff met its burden where its damages expert based profits on defendant's financial documents and where defendant's CFO agreed on profit figure).

   b. Deductions

  Defendant claims a total of over $9.5 million in cost deductions, yet it has produced troublingly little evidence to support that figure.  Not a single invoice, receipt, or other original source document has been produced to support the costs and expenses Defendant claims.  Indeed, the only documents Defendant has offered in support of its claimed deductions are summary financial reports, which were created by Semikian in preparation for this litigation.  See Exs. 2030-31.  Defendant's damages expert, John Bone, relied on the summary financial documents to arrive at the $9.5 million deduction figure, but he did not review any original source documents in doing so.[4]  Day 2 Vol. 2 Tr. 32:7-15.  In short, there is no evidence to support the specific figures set forth in either Exhibit 2030 or Exhibit 2031.

_____

parties as credible, it appears possible from the information provided by Defendant that its sales exceeded this amount.

 [4] Bone repeatedly emphasized that Plaintiffs never requested that Defendant produce any original source documents, but that is irrelevant.  It is Defendant's burden to produce evidence sufficient to support its deductions claim, regardless of the evidence Plaintiffs sought to discover prior to trial.  See Lindy Pen, 982 F.2d at 1408.

1    First, the Court finds no credibility as to

2 Defendant's claimed payments to VTEK of over $7.3

3 million.  Aside from the lack of evidence to support the

4 document summarizing these payments, see Ex. 2030, the

5 Court has a number of concerns regarding the stated

6 figures themselves.  In particular, both the timing of

7 payments and the amount of each payment were highly

8 irregular.  Day 2 Vol. 2 Tr. 100:8-102:6.  Such a lax

9 payment arrangement is unusual between two companies

10 with no prior business relationship.  Id. at 101:8-21.

11    It is possible that Defendant had a unique

12 relationship with VTEK that allowed for irregular

13 payments.  But in light of such an unusual payment

14 system, Defendant should have been especially mindful to

15 keep clear records.  Had an invoice, receipt, or other

16 source document been produced during trial to support

17 the VTEK payments, Defendant may very well have met its

18 burden as to that deduction.  But the only documentary

19 evidence in support of the $7.3 million figure — aside

20 from the made-for-litigation summary financial document,

21 see Ex. 2030 — is Semikian's testimony that these

22 payments did occur and are accurate.  He testified that

23 Bob and Jaber would agree on an arbitrary amount for

24 Defendant to pay to VTEK that was not tied to any

25 invoice.  Day 2 Vol. 1 Tr. 77:20-78:11.  Semikian would

26 then manually input the amount he paid into Defendant's

27 QuickBooks account.  Id.  This testimony is simply not

28 enough to overcome Defendant's burden to prove that

these payments occurred in light of the aforementioned irregularities.  Without any corresponding invoices or other documentation to substantiate this unusual payment system, the Court has no way to confirm the accuracy of the payments listed in Exhibit 2030.[5]

The same lack of evidentiary support belies Defendant's claimed deduction for shipping and delivery expenses of over $2 million.  While these payments are slightly more regular than Defendant's payments to VTEK, there are still some months with multiple payments and other months with no payments at all.  See Ex. 2031.  Moreover, the shipping and delivery costs increased drastically between September and November 2020.  Id.  The only explanations Defendant offered for this increase were the two-month gap in payments, the supply chain bottleneck, and the increased weight of the XXL vape as compared to the other two models.  See Day 2 Vol. 1 Tr. 83:14-84:3.  However, none of these explanations justifies a cost increase of over six times the previous monthly shipping cost, and other payments that were more than ten times prior shipping costs.  In

---

[5] Defendant points to Voth's statement that if the average cost per unit of the Infringing Products was $4, and Defendant sold about 1.8 million units, then there is support for Semikian's claim that total costs were around $7 million.  See Day 2 Vol. 2 Tr. 126:9-127:14.  There is no evidence before the Court as to the Infringing Products' average cost per unit, however, so any assumption as to that amount is speculative.  Moreover, Voth testified during trial that Jaber's deposition testimony about average cost per unit was vague and equivocal.  Id. at 125:8-21.

1    addition, there appears to be no correlation between the

2    payments made to VTEK and the claimed shipping and

3    delivery costs.

4        Without any additional support, the Court finds no

5    credibility as to the summary financial documents put

6    forth as Exhibits 2030 and 2031.  Consequently, the

7    Court finds that Defendant has failed to meet its burden

8    to prove deductions based on either: 1) payments made to

9    VTEK, or 2) shipping and delivery expenses.

10       Other courts have similarly found that summary

11   financial documents coupled with testimony, absent any

12   documentary evidence, were insufficient to satisfy the

13   defendant's burden to prove costs.  See Brighton

14   Collectibles, LLC v. Believe Production, Inc., No. 2:15-

15   cv-00579-CAS(ASx), 2018 WL 1381894, at *7 (C.D. Cal.

16   Mar. 15, 2018) (declining to deduct cost where only

17   evidence in support of cost was witness testimony and

18   spreadsheets produced by the witness); Brighton

19   Collectibles, Inc. v. Marc Chantal USA, Inc., No. 06-CV-

20   1584 H (POR), 2009 WL 10674076, at *10 (S.D. Cal. Aug.

21   12, 2009) (declining to deduct costs because defendant

22   "did not submit any documentary evidence such as

23   invoices to substantiate its claimed deductions").

24   Because Defendant has failed to meet its burden, the

25   Court declines to make any deductions on these bases.

26   See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772

27   F.2d 505, 514 (1985) (citing Russell v. Price, 612 F.2d

28   1123, 1130-31 (9th Cir. 1979) ("If the infringing

14

defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits.").

Defendant also seeks a deduction of $189,632 for selling and operating expenses.[6]  Plaintiffs' experts did not dispute this deduction at trial.  The Court therefore deducts $189,632 in allocated selling expenses from Plaintiff's monetary award.

### c.  Apportionment

Disgorgement of profits "is intended to award profits only on sales that are attributable to the infringing conduct."  Lindy Pen, 982 F.2d at 1408.  However, "[o]nce the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity."  Id.  It is therefore the defendant's burden to demonstrate which of its total sales are not attributable to the infringing activity.  Id.  District courts should not apportion profits where they cannot do so based on a "reasonable, nonspeculative formula."  Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 519 (9th Cir. 1985).

To argue that some of Defendant's profits are not

---

[6] To arrive at this figure, Bone first determined Defendant's total selling expenses using its income statements. Day 2 Vol. 2 Tr. 21:7-14.  He then used the same income statements to determine the percentage of total sales attributable to the Infringing Products.  Id.  Bone then allocated selling expenses based on this percentage to determine the amount of selling expenses attributable to the Infringing Products.  Id.  Courts have approved of similar allocation methods when actual overhead costs for individual products could not be determined.  See Kamar Int'l, Inc. v. Russ Berrie & Co., Inc., 752 F.2d 1326, 1333 (9th Cir. 1984).

attributable to the infringement of the BANG Marks, Bone
relied on a likelihood of confusion survey conducted by
Plaintiff's survey expert, Justin Anderson.  The
Anderson survey found that approximately 20% of survey
respondents somehow associated Design One and Design Two
with the BANG Marks.  Thus, Bone reasoned that because
80% of survey respondents did not associate the two,
then 80% of Defendant's sales cannot be attributed to
its infringement of the BANG Marks.  Day 2 Vol. 2 Tr.
26:8-18.

This logic is flawed for a number of reasons.
First, the Anderson survey did not narrow respondents to
actual purchasers of Bang vapes, so it reveals nothing
as to why actual Bang vape consumers decided to purchase
that product.  Id. at 57:14-18.  Second, consumer
confusion as to affiliation is not an accurate measure
of the importance a consumer places on a brand name and
logo when deciding to purchase a product.  Id. at 62:16-
63:25.  It is therefore unsurprising that other courts
have rejected the use of a likelihood of confusion
survey to apportion profits.  See Globefill Inc. v.
Elements Spirits, Inc., No. 2:10-cv-02034-CBM (PLAx),
2017 WL 6520589, at *3 (C.D. Cal. Sept. 8, 2017); adidas
America, Inc. v. Skechers USA, Inc., No. 3:15-cv-01741-
HZ, 2017 WL 3319190, at *28 (D. Or. Aug. 3, 2017).

Defendant offers no additional evidence showing
that any of its sales were not attributable to its
unlawful infringement.  Thus, the Court awards all of

Defendant's net profits to Plaintiff because the "infringing and noninfringing elements of [the] work cannot be readily separated." Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1012 (9th Cir. 1994) (quoting Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 261-62 (1916)).

3. Statutory Enhancement

If a court finds that recovery based on profits is either inadequate or excessive, the court in its discretion may enter judgment in an amount it finds to be just. 15 U.S.C. § 1117(a). If the court exercises its discretion to adjust the award, the sum "shall constitute compensation and not a penalty." Id. To penalize defendants for misconduct by enhancing Lanham Act damages is an abuse of discretion; enhancement is only available to ensure that the plaintiff receives adequate compensation. Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1115 (9th Cir. 2012).

The Court finds that an award based on disgorgement of profits will adequately compensate Plaintiffs for Defendant's infringement. Indeed, Plaintiffs' argument in favor of a statutory enhancement is based on Defendant's conduct rather than any losses they suffered that disgorgement of profits would not compensate for. See Day 1 Vol. 1 Tr. 21:12-25. Enhancement based on Defendant's conduct alone would constitute a penalty, so the Court declines to enhance Plaintiffs' award.

For the foregoing reasons, the Court awards

1  Plaintiffs a total of **$10,584,308.48** in disgorged

2  profits.

3  **B.   Permanent Injunction**

4      The Lanham Act empowers district courts to grant

5  injunctions to prevent the violation of a plaintiff's

6  trademark rights.  15 U.S.C. § 1116(a).  To be awarded a

7  permanent injunction, a plaintiff must show that: (1)

8  the plaintiff has suffered irreparable injury; (2) legal

9  remedies are inadequate to compensate the plaintiff for

10 the injury; (3) the balance of hardships favors an

11 injunction; and (4) the public interest would be served

12 by the injunction.  eBay, Inc. v. MercExchange, LLC, 547

13 U.S. 388, 391 (2006).

14     1.   Irreparable Injury

15     Plaintiffs who prove a violation of the Lanham Act

16 are entitled to a rebuttable presumption of irreparable

17 harm.  15 U.S.C. § 1116(a).  Because Defendant

18 stipulated to trademark infringement and has offered no

19 evidence to rebut the presumption, irreparable harm is

20 presumed.  See Nintendo of Am., Inc. v. Storman, No. CV

21 19-7818-CBM-(RAOx), 2021 WL 4772529, at *2 (C.D. Cal.

22 Aug. 5, 2021).

23     2.   Inadequate Legal Remedies

24     "Injunctive relief is the remedy of choice for

25 trademark and unfair competition cases, since there is

26 no adequate remedy at law for the injury caused by a

27 defendant's continuing infringement."  Century 21 Real

28 Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir.

1   1988).  In addition, "[d]amage to reputation and loss of
2   customers are intangible harms not adequately
3   compensable through monetary damages."  Leadership
4   Studies, Inc. v. ReadyToManage, Inc., No. 2:15-cv-09459-
5   CAS(AJWx), 2017 WL 2408118, at *6 (C.D. Cal. June 2,
6   2017) (quoting Car-Freshner Corp. v. Valio, LLC, No.
7   2:14-cv-01471-RFB-GWF, 2016 WL 7246073, at *8 (D. Nev.
8   Dec. 15, 2016)).

9       The Court has no evidence before it indicating that
10  Defendant will never begin selling the Infringing
11  Products again.  While Defendant eventually stopped
12  selling the Infringing Products, it did not do so until
13  well into the litigation of this case.  Moreover,
14  Plaintiffs introduced evidence at trial of reputational
15  harm they suffered as a result of the association
16  between BANG energy drinks and the Infringing Products.
17  See Exs. 42, 60-61.  Plaintiffs have therefore
18  established that legal remedies are inadequate.

19      3.  Balance of Hardships
20      Defendant will not be harmed by an injunction
21  preventing it from selling the Infringing Products
22  because Defendant has already stopped selling products
23  that use Design One and Design Two.  Moreover, as
24  discussed above, Plaintiffs have shown that they may
25  suffer continued reputational harm and loss of good will
26  if an injunction is not entered.  Therefore, the balance
27  of hardships favors granting an injunction.  See AirWair
28  Int'l Ltd. v. ITX USA LLC, No. 19-cv-07641-SI, 2021 WL

1  5302922, at *4 (N.D. Cal. Nov. 15, 2021) (citation and
2  internal quotation marks omitted) ("Defendant will
3  experience little to no hardship so long as defendant
4  does not infringe and without an injunction plaintiff
5  would be needlessly vulnerable to future infringement
6  necessitating additional litigation.").

7      4.  Public Interest

8      Injunctive relief will serve the public interest
9  here by preventing consumer confusion and will vindicate
10 the Lanham Act by protecting the brands of authorized
11 trademark users.  See Knature Co., Inc. v. Duc Heung
12 Grp., Inc., No. CV 20-3877-DMG (AFMx), 2021 WL 3913194,
13 at *5 (C.D. Cal. Jul 2, 2021).  There are no exceptional
14 circumstances present here indicating that an injunction
15 would be against the public interest.  See Leadership
16 Studies, Inc., 2017 WL 2408118, at *6.  Thus, this
17 factor favors entering a permanent injunction.

18     In sum, all of the eBay factors favor a permanent
19 injunction in this case.  The Court therefore **GRANTS**
20 Plaintiffs a permanent injunction against Defendant
21 preventing Defendant from selling any products using
22 Design One or Design Two.[7]

23 _____

24    [7] Defendant requests clarity as to whether it may continue
   to use the "vape with a bang" tagline on products sold under
   brand names other than "Bang."  See Def.'s Closing Arg. Brief
25 23:16-20, ECF No. 199.  Plaintiffs do not appear to oppose this
   request.  See generally Pls.' Reply to Def.'s Closing Arg. Brief,
26 ECF No. 200.  The Court agrees that Defendant should be permitted
   to continue using this tagline on products that do not use Design
27 One or Design Two.  Plaintiffs have not shown that use of the
   word "bang" alone, when detached from Designs One and Two, is
28 likely to cause consumer confusion.  Therefore, these sales need

## C.  Attorneys' Fees

The Lanham Act authorizes courts to award reasonable attorneys' fees to the prevailing party in "exceptional cases."  15 U.S.C. § 1117(a).  "[D]istrict courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional . . . using a preponderance of the evidence standard."  SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179, 1181 (9th Cir. 2016).  Factors to consider include: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 n.6 (2014)).

In short, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."  Id. at 554.  A court's finding that a defendant's infringement was willful does not automatically compel an award of attorneys' fees to the prevailing plaintiff.  See UL LLC v. Space Chariot Inc., 250 F. Supp. 3d 596,

---

not be enjoined.  See Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1062 (N.D. Cal. 2010) ("Generally, an injunction must be narrowly tailored to remedy only the specific harms shown by a plaintiff, rather than to enjoin all possible breaches of the law.").

1   615 (C.D. Cal. 2017).

2        Here, while the Court determined early on that

3   Plaintiffs had a high likelihood of success on the

4   merits of their trademark infringement claims, Defendant

5   raised nonfrivolous arguments that led the Court to

6   twice deny Plaintiffs' requests for a preliminary

7   injunction.  And while the Court has found that

8   Defendant's infringement was willful, it cannot say that

9   Defendant's litigating position was objectively

10  unreasonable.  Plaintiffs put forth no evidence that

11  Defendant was aware of the BANG Marks when it began

12  selling the Infringing Products.  Energy drinks also

13  occupy a distinct market from vaping products, and

14  Plaintiffs have not exhibited an intent to expand into

15  the vape industry.  See Globefill Inc. v. Elements

16  Spirits, Inc., No. 2:10-cv-02034-CBM (PLAx), 2017 WL

17  6520589, at *3-4 (C.D. Cal. Sept. 8, 2017) (finding a

18  case to be unexceptional where plaintiff's product was

19  different from infringing product and plaintiff had no

20  plans to expand into infringing product's market).

21        Attorneys' fees are also not necessary for purposes

22  of compensation or deterrence.  The disgorgement award

23  will fully compensate Plaintiffs for Defendant's

24  infringement, and the permanent injunction will

25  sufficiently deter any risk of future infringement.  Cf.

26  Y.Y.G.M. SA v. Redbubble Inc., No. 2:19-cv-04618-RGK-

27  JPR, 2021 WL 4553186, at *4-5 (C.D. Cal. Oct. 5, 2021)

28  (finding a risk of future infringement where the court

denied injunctive relief and defendant could not guarantee that its policing techniques would completely eliminate future infringement).  Defendant also did not litigate this case in an unreasonable manner that requires deterrence for future cases.  While Defendant had a low likelihood of success in defending against trademark infringement, it stipulated to its own liability and thereby streamlined issues for trial.

Under the totality of the circumstances, the Court finds that this is not an exceptional case that stands out from others.  See UL LLC, 250 F. Supp. at 615 (finding a case to be unexceptional despite defendants' willful infringement and failure to cooperate during discovery); Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc., No. 20-35369, 2021 WL 3630225, at *2 (9th Cir. Aug. 17, 2021) (finding that district court did not abuse its discretion in concluding the case was unexceptional despite defendant's willful infringement). The Court therefore exercises its discretion to **DENY** Plaintiffs' request for attorneys' fees.

///
///
///
///
///
///
///
///

23

### III.   CONCLUSION

Based on the foregoing, the Court awards Plaintiffs **$10,584,308.48** in disgorged profits.  The Court also **GRANTS** Plaintiffs' request for a permanent injunction. Defendant is hereby enjoined from selling any products using Design One or Design Two.  Finally, the Court **DENIES** Plaintiffs' request for attorneys' fees.  Within seven (7) days of this Order, Plaintiff shall lodge a Proposed Judgment with the Court consistent with the conclusions set forth herein.

**IT IS SO ORDERED.**

DATED: July 26, 2022                        /s/ Ronald S.W. Lew
                                   _____
                                   **HONORABLE RONALD S.W. LEW**
                                   Senior U.S. District Judge